**AMERICAN INSURANCE ASSOCIATION, Plaintiff,**

v.

**Robert L. CLARKE,\* et al., Defendants.**

**Civ. A. No. 85–1489.**

United States District Court, District of Columbia.

March 10, 1987.

Timothy C. Russell, Martin E. Lybecker, Drinker, Biddle & Reath, Washington, D.C., for plaintiff.

Thomas E. Wilson, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for Alliance of American Insurers.

Sandra M. Schraibman, Hermes Fernandez, Wendy Kloner, U.S. Dept. of Justice, Civil Div., Programs Branch, Washington, D.C., for defendants.

Arnold M. Lerman, Michael S. Helfer, Kerry W. Kircher, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff American Insurance Association (AIA) brings this action challenging a ruling by defendant Comptroller of the Currency that would allow Citibank, a national bank subsidiary of a registered bank holding company, to offer a type of municipal bond insurance in the form of standby letters of credit. AIA, joined by *amici* the National Association of Life Underwriters and the National Association of Professional Insurance Agents, argue that the sale of such insurance is beyond the authority conferred on national banks by the National Bank Act, 12 U.S.C. §§ 1 *et seq.*, is proscribed by judicial precedent, and runs afoul of the strictures of the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841 *et seq.* (BHCA). Defendant, the regulatory agency charged with implementing the National Bank Act, along with intervenor Citibank, N.A. (collectively "defendants"), contend that the municipal insurance at issue is the functional equivalent of standby letters of credit, which have long been recognized as permissible forms of credit under the National Bank Act, and do not contra-

vene the judicial prohibition on bank guarantees. They further argue that Federal Reserve Board regulations do not require the Comptroller to stay its approval of Citibank's activity pending the Board's own assessment of that activity under the BHCA. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court finds that Citibank's municipal bond insurance is permissible activity under governing federal banking laws and that defendants therefore are entitled to summary judgment.

## I

Citibank, a national banking association subject to the regulatory and supervisory jurisdiction of the Comptroller, gave notice by letter dated January 29, 1985, that it planned to establish an operating subsidiary to engage in the municipal bond insurance business. Under Citibank's proposal, issuers, purchasers, or underwriters of municipal bonds will apply to the subsidiary for bond insurance in the form of standby credits. If the bonds are of a type which a national bank may purchase directly, the subsidiary will assess the creditworthiness of the issuer and determine an appropriate fee for the issuance of the credit. Administrative Record (AR) at 1. If the creditworthiness of the issuer satisfies the subsidiary, it will issue the standby credit, thereby committing to pay bondholders in the event of a default by the issuer. *Id.* Should the issuer fail to pay the interest and principal when due, the bondholder would draw on the standby credit by presenting the unpaid bond or by notifying the subsidiary that default has occurred. Upon such payment, the subsidiary would then become subrogated to the bondholder's primary right to payment from the issuer.

By letter dated May 2, 1985, the Comptroller concurred in Citibank's proposal. It found that while the proposed product is considered insurance under state law, the standby credits are in substance letters of credit, the issuance of which is a traditional banking practice permissible under section 24 (Seventh) of the National Bank Act. Letter of Michael Patriarca, Deputy Comptroller for Multinational Banking, to Pat-

rick J. Mulhern, Senior Vice-President and General Counsel of Citibank, N.A. (May 2, 1985) at 2; AR at 98. The standby credits meet the agency's guidelines for letters of credit in that they are for a definite term, are limited in amount, obligate the subsidiary to pay upon presentation of a document, and result in the customer's unqualified obligation to reimburse the subsidiary for any payments made to beneficiary bondholders. *Id.* The Comptroller determined that the subsidiary's proposed activities are consistent with safe and sound banking practices because the subsidiary will issue standby credits on the basis of an assessment of the bond issuer's financial strength, rather than on an actuarial computation of the likelihood that a particular issuer will default. The former analysis, the agency noted, is typical of bank lending and credit practices, while the latter is a hallmark of the insurance business. Patriarca Letter at 3–4; AR at 99–100. The Comptroller further found that because the subsidiary's proposed standby credits are independent contracts imposing a primary obligation on the subsidiary to pay bondholders, they are not impermissible guarantees. Guarantees, which are ancillary contracts conditioning the guarantor's obligation to make payment on the performance and satisfaction of the terms of the principal contract, require guarantors to gauge the likelihood of default or non-performance. The agency determined that here the primary obligation imposed by the standby credits requires the subsidiary to assume that default will occur, and to assess the bond issuer's ability to make repayment in that event. *Id.* at 3; AR at 99. Finally, the Comptroller concluded that the BHCA does not proscribe the municipal bond insurance at issue here. *Id.* at 4–5; AR at 100–01.

Thereafter, Citibank established AMBAC Indemnity Corporation, the operating subsidiary offering the disputed municipal insurance. Plaintiff, along with the Alliance of American Insurers (AAI), filed suit challenging the Comptroller's decision, and Citibank intervened as a party defendant. Defendants moved to dismiss on the ground

that plaintiff lacked standing, an argument the Court accepted with respect to AAI but rejected as to AIA. *American Insurance Association v. Selby,* 624 F.Supp. 267 (D.D.C.1985). The pending cross-motions for summary judgment then followed.

## II

Plaintiff attacks the Comptroller's decision on three grounds. First, it argues that the activity at issue here is not included among the express powers enumerated by section 24 (Seventh) of the National Bank Act, and does not fall within the reach of the "incidental powers" clause of the Act as that clause has been construed by the courts. Accordingly, plaintiff contends, municipal bond insurance is an activity that exceeds the authority of a national bank. Second, plaintiff argues that Citibank's standby credit is at bottom a promise to answer for the payment of the debt of another, if the person liable in the first instance fails to make payment, and as such is an impermissible guarantee under the National Bank Act. Finally, plaintiff claims that Citibank's proposal raises a substantial question as to whether or not the bank's holding company, Citicorp, is in violation of the BHCA by virtue of the subsidiary's insurance activity. Plaintiff contends that the Comptroller should have conditioned its concurrence on the Federal Reserve Board's resolution of that question and that, in view of the Comptroller's failure to do so, this Court should enjoin Citibank's insurance activity in order to preserve the Board's jurisdiction over the matter. The Court addresses each of these contentions in turn.

### A. *The Business of Banking*

Plaintiff correctly notes that Citibank's subsidiary, like Citibank itself, may exercise only those powers either expressly conferred by the National Bank Act,[1] or those

"incidental powers ... necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). Plaintiff argues that the Act itself contains no provision authorizing banks to engage in general insurance underwriting activities, much less municipal bond insurance, thus the subsidiary's activity is permissible only if it fits within the "incidental powers" clause. That clause has been defined as encompassing those activities "directly related to" and "convenient or useful" to the performance of customary and expressly authorized banking services. *M & M Leasing Corp. v. Seattle First National Bank,* 563 F.2d 1377, 1382 (9th Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Arnold Tours, Inc. v. Camp,* 472 F.2d 427, 431–32 (1st Cir.1972). The only expressly authorized banking services that municipal bond insurance could conceivably be related to, plaintiff contends, are the power to "loan money on personal security" and to purchase municipal debt securities for the bank's own account. 12 U.S.C. § 24 (Seventh). According to plaintiff, however, the subsidiary's activity is neither directly related nor convenient to a bank's lending function, but is instead a radical departure from that customary activity which places Citibank squarely in the business of insuring rather than lending. Plaintiff argues that as a lender, a bank grants a borrower, such as a municipality, the temporary use of its funds in exchange for a payment of interest. In so doing, of course, the bank assumes a risk of nonpayment. To safeguard against this risk, the bank not only assesses the creditworthiness of the borrower, but because such assessments are not infallible, the bank also fixes its interest rates at levels calculated to permit a reasonable profit even if some defaults occur. Nonetheless, the bank's principal compensation is the payment of interest, which reflects the market price for the use of its funds, not a risk premium. Here,

---

1. Section 24 (Seventh) of the Act provides that a national banking association may:

"... exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts,

bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

plaintiff insists, the fee Citibank's subsidiary will receive for its insurance is unmistakably a risk premium. Under the proposal, the subsidiary is not a lender since it advances no funds to the municipality; instead, it is in the position of a borrower obliged to repay the true lenders—the municipal bondholders—in the event of a default. The mere fact that the subsidiary undertakes a credit analysis is, in plaintiff's view, irrelevant. Such an undertaking is customary in property and casualty insurance, and in no way alters the fact that the subsidiary's compensation is an insurance premium, calculated on the basis of the bank's underwriting judgment concerning the likelihood of default.

Plaintiff's argument proceeds from a narrow and artificially rigid view of both the business of banking and the statute that governs that business, a view that the Comptroller, and this Court, reject. Whether or not the five enumerated powers set out in the National Bank Act are an exhaustive list or, as some commentators have argued, merely illustrative, *see e.g.,* Symons, *The "Business of Banking" in Historical Perspective,* 57 Geo.Wash.L. Rev. 67 (1983), the Court cannot accept plaintiff's cramped and simplistically literal interpretation of the banking industry's lending power. At bottom, "[t]he business of banking reduces to the provision of financial support for the transactions of others." Letter from James E. Smith, Comptroller of the Currency, [1973–78 Transfer Binder] Fed.Bank.L.Rep. (CCH) ¶ 96,301 at 81,417. Banks can and do provide such support by means other than direct loans of their own funds. As then Judge Cardozo explained over fifty years ago, the business of banking involves the substitution of the "[bank's] own credit, which has general acceptance in the business community, for the individual's credit, which has only limited acceptability.... It is the end for which a bank exists." *Block v. Pennsylvania Exchange Bank,* 253 N.Y. 227, 170 N.E. 900, 901 (N.Y.1930). Indeed, the extension of credit on both a secured and unsecured basis is such a long-standing practice under the National Bank Act, *see e.g., The Third National Bank v. Blake,* 73

N.Y. 260, 263 (Ct.App.1878); *National Bank v. Case,* 99 U.S. (9 Otto) 628, 633, 25 L.Ed. 448 (1878), that credit is today viewed as one of "[t]he principal banking 'products.'" *United States v. Philadelphia National Bank,* 374 U.S. 321, 326 n. 5, 83 S.Ct. 1715, 1721 n. 5, 10 L.Ed.2d 915 (1963). Banks provide this "product" in a variety of forms not specifically enumerated in the Act: they offer irrevocable lines of credit, standby and mercantile letters of credit, and check guaranty and credit card programs. *See e.g.,* 12 C.F.R. §§ 7.7017, 7.7016, 7.378, 32.3 (1985).

■ The question then is not, as plaintiff couches it, whether the National Bank Act expressly authorizes banks to engage in the municipal bond insurance business, or whether that business is directly related and useful to what plaintiff narrowly conceives as the lending function—*i.e.* the direct advance of funds to a borrower. Rather, the question is whether the Comptroller correctly found that the issuance of standby credits in the form of municipal bond insurance is a basic credit transaction permissible under the Act. Applying its particular financial expertise, the Comptroller determined that, notwithstanding their name, the standby credits at issue here are the functional equivalent of standby letters of credit, and are thus a permissible extension of credit in the form of an advance commitment to honor a customer's obligations in the event the customer defaults. As that determination is neither erroneous nor arbitrary and capricious, the Court will not disturb it.

While plaintiff and *amici* expend considerable effort demonstrating that national banks are not permitted, with certain exceptions, to sell or underwrite insurance, there can be no serious quarrel with the Comptroller's assertion that it is entitled to look beyond the label given a certain activity to determine whether or not it is permissible. "The validity of the commitments undertaken in a particular [financial] instrument ... cannot rationally be ascertained or tested by mere examination of the label that the instrument bears." H. Harfield, *Bank Credit and Acceptances* (5th

ed. 1974) (hereinafter "Harfield") at 164–65. Indeed, in *M & M Leasing Corp. v. Seattle First National Bank,* 563 F.2d 1377 (9th Cir.1977), the Ninth Circuit determined that national banks were permitted to lease motor vehicles and other personal property because the leases at issue were "functionally interchangeable" with secured loans. *Id.* at 1383. The court stressed that this "functional interchangeability" was the "touchstone" of its decision, and noted that "[w]hether third parties in other contexts should treat leases that are equivalent to loans as nonetheless distinct and separate ... should not influence our opinion in this case." *Id.* Here, the Comptroller determined that the subsidiary's standby credits are "functionally equivalent" to standby letters of credit, which are a well-recognized form of credit. Generally, a credit is:

> an original undertaking by one party (the issuer) to substitute his financial strength for that of another (the account party), with that undertaking to be triggered by the presentation of a draft or demand for payment and, often, other documents. The credit arises in a number of situations, but generally the account party seeks the strength of the issuer's financial integrity or reputation so that a third party (the beneficiary of the credit) will give value to the account party. The beneficiary extends credit by selling goods or services to the account party on credit, by taking the account party's negotiable paper, or by lending the account party money.

J.F. Dolan, *The Law of Letters of Credit: Commercial and Standby Credits* (1984) (hereinafter "Dolan") at ¶ 2.02. That is the essence of the transaction at issue here. The subsidiary, or issuer, will substitute its financial strength for that of the municipal-

ity, the account party, by promising to honor the municipality's obligations to bondholders in the event of a default. Because of this undertaking by the subsidiary, third parties will give value to the municipality by purchasing its bonds. The subsidiary's undertaking will be triggered by presentation of a demand for payment by the third party bondholders, either in the form of a notice of default or by simply presenting the bond itself after the date payment is due.

In its letter of concurrence, the Comptroller found that the subsidiary's standby credits satisfied all the criteria set out in the regulation governing letters of credit, save for the requirement that they be labeled "letters of credit." [2] It noted that the standby credits "are for a definite term, are limited in amount, obligate the operating subsidiary to pay upon presentation of a document ..., and result in an unqualified obligation of its customer to reimburse the operating subsidiary for payments made to the beneficiary...." Patriarca letter at 2; AR at 98. The Comptroller acknowledged that the standby credits were not denominated letters of credit, but observed that exceptions to this requirement have been made in the past and that, in any event, the substance of a transaction, rather than its label, should control.

The Comptroller further buttressed its conclusion that the subsidiary's municipal bond insurance activity is in fact a credit activity by noting that the subsidiary will issue standby credits on the basis of the municipality's creditworthiness, rather than on an actuarial judgment concerning the likelihood of default. While plaintiff argues that such credit assessments are common to casualty and property insurance as well, this argument misses the point. "Banking" and "insurance" are not mutual-

---

2. The regulation provides that:

"As a matter of sound banking practice, letters of credit should be issued in conformity with the following: (a) Each letter of credit should conspicuously state that it is a letter of credit or be conspicuously entitled as such; (b) the bank's undertaking should contain a specified expiration date or be for a definite term; (c) the bank's undertaking should be limited in amount; (d) the bank's obligation to pay should arise only upon the presentation of a draft or other documents as specified in the letter of credit, and the bank must not be called upon to determine questions of fact or law at issue between the account party and the beneficiary; (e) the bank's customer should have an unqualified obligation to reimburse the bank for payment under the letter of credit."

12 C.F.R. § 7.7016.

ly exclusive businesses; "from a functional point of view there is a considerable overlap between the [two]." Harfield at 184. Whether or not this overlap is, as some maintain, the result of the insurance industry's encroachment on the business of banking,[3] the essential fact here is that in issuing the standby credits, the operating subsidiary will assume that a default will occur and will therefore undertake a financial assessment of the municipal issuer, not an actuarial judgment. That insurers also engage in credit assessments in no way alters the fact that such an analysis lies at the heart of a bank's lending activities. Such an investigation into the issuer's creditworthiness is "a typical financial-judgment process similar to the ones the bank makes in any commercial-loan setting." Dolan at ¶ 12.03[1][b]. Indeed, the distinction between a credit and an actuarial assessment is precisely that which separates a letter of credit from a surety.

> If the banker, in the exercise of his informed *credit* judgment, decides that his customer will be capable of making a money payment at a particular time and in a particular amount, then the banker is justified in undertaking to make that payment on behalf of the customer, *and it is of almost no moment* whether the commitment is in the form of a present advance of funds, an undertaking by way of an unconditional commitment to lend to the customer, *or by way of a commitment to third parties to make the payment on behalf of the customer at the time and in the amounts specified.* If, on the other hand, the banker assumes the role of a surety and makes a commitment on the assumption that his customer's mercantile capacity is such that the banker's commitment will not be called

upon, that is neither sound nor appropriate banking practice.

Harfield at 165 (emphasis added). That the subsidiary will engage in such credit analyses, far from being irrelevant as plaintiff contends, underscores the validity of the Comptroller's determination that the issuance of standby credits in the form involved here is a permissible banking activity.

Plaintiff's other attempts to distinguish the municipal bond insurance at issue here from other credit transactions are equally unpersuasive. Plaintiff makes much of the fact that the subsidiary's compensation for its services is not in the form of interest charged for the use of its funds, and thus insists that the subsidiary's fee is necessarily a "risk premium." As just noted, however, the Comptroller reasonably found that, as with any other letter of credit, the subsidiary will issue its standby credits on the basis of credit judgments, not on actuarial or risk assessments. Unlike the typical insurer then, the subsidiary is not in the business of spreading losses over large numbers of insureds, but is instead enhancing the marketability of municipal bonds by placing its financial strength behind that of the issuing municipality. It is difficult to see how the subsidiary's fee for this service is necessarily a risk premium, unless the fees charged by banks for other similar extensions of credit are also so characterized. The Comptroller reasonably concluded that this fee was akin to a loan commitment fee or a prepayment of interest. However such fees are labeled, it is clear that extensions of credit in forms other than direct loans are not rendered impermissible simply because the credit-extending bank receives compensation other than interest.[4]

---

**3.** Professor Harfield notes that "the modern surety is apt to give greater priority to the financial standing of his principal than to his principal's ability to perform a particular contract. Th[e] overlap [between the business of banking and the insurance business], however, appears more to be an incursion of suretyship into the banking business than the reverse." Harfield at 165. *See also What's Behind the Bittersweet Boom in Financial Guarantees,* Business Week, September 17, 1984, at 117 (observing that the introduction of municipal bond insurance by

insurers represents an attempt to supplant letters of credit traditionally used to support municipal bond issues, and thus give insurers an opportunity to earn a piece of the municipal bond pie).

**4.** In the event of a default, of course, the subsidiary would advance funds to the bond-issuer by paying bondholders, and would then charge interest on the debt so created.

Plaintiff's contention that the subsidiary acts as an insurer rather than as a lending bank because it disburses funds only in the event of a loss or calamity is similarly misplaced. One of the hallmarks of a letter of credit is that payment is made upon presentation of documents, rather than upon proof of certain extrinsic facts. While it is true that the subsidiary will not make payment except in the event of a default, its obligation to pay third party beneficiaries is triggered, as with any other letter of credit, by the simple presentation of documents—either a notice of default or the bonds themselves. No lengthy factual inquiry is required, and no disputes arising out of any related contracts need be resolved beforehand.

Plaintiff suggests that the Court cannot take seriously, as the Comptroller apparently did, Citibank's self-serving assertion that the risk-selection and premium-rating practices of the subsidiary will not involve any actuarial analysis. Municipal bond insurance premium rates, plaintiff insists, must be calculated with at least some consideration given to the likelihood that a number of the bond issuers will default. As the Comptroller is a regulatory agency charged with administering the National Bank Act, however, its ruling on questions concerning the realities of banking practices is entitled to considerable deference, and this Court will not lightly assume that the Comptroller accepted without investigation or reflection representations that are implausible on their face.[5] In addition, even plaintiff acknowledges, in its discussion of permissible interest-bearing lending practices, that "[s]ince even the most painstaking credit analysis may not prevent all 'bad debt' losses ... a lending bank also fixes its interest rates at levels calculated to allow a reasonable profit even if some losses do occur." Plaintiff's Motion for Summary Judgment at 33. If banks may so supplement credit assessments when lend-

ing funds directly, it is difficult to see how this same supplementary analysis invalidates an otherwise permissible extension of credit.

Finally, plaintiff contends that the subsidiary's proposed activity will result in a quantum increase in the amount of credit risk borne by the bank. The Comptroller expressly found, however, that the proposal satisfies applicable safety and soundness standards, and that the bank's credit risk would be maintained within regulatory limits. AR at 98–99. In addition, this contention is essentially irrelevant to the question of whether the issuance of standby credits is within a bank's powers.

In sum, the Court finds that the Comptroller correctly determined that the issuance of standby credits in the form of municipal bond insurance is a type of credit activity within the powers of a national bank under the National Bank Act.

### B. *The No-Guarantee Rule*

Plaintiff next challenges Citibank's municipal bond insurance activity on the ground that it violates the long recognized rule that prohibits national banks from guaranteeing the debts of others. This prohibition, first established in the latter half of the nineteenth century, *see Bowen v. Needles National Bank*, 94 F.2d 925 (9th Cir.1899), *cert. denied*, 176 U.S. 682, 20 S.Ct. 1024, 44 L.Ed. 637 (1900), is still in force today. *See First Empire Bank-New York v. Federal Deposit Insurance Corp.*, 572 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1975). The parties recognize, however, that the rule is easily overstated; not all guarantees, generally speaking, are impermissible. Standby letters of credit operate as "guarantees" in the broadest sense of the word: they are "security devices" and have been "used to insure construction

---

**5.** Plaintiff argues that the Comptroller's May 2, 1985 ruling is entitled to little or no deference because the agency merely adopted the bank's assertions without independent analysis. The ruling states that "[t]he Office agrees that [the bank's] activity is permissible and incorporates in the following analysis the Bank's letters dated

January 29, and April 11, 1985." AR at 97. The Court, however, does not read this statement as an acknowledgement that the agency accepted uncritically the bank's representations, without undertaking any review or analysis of the bank's assertions.

loans, as quasi-performance bonds, to support the issuance of commercial paper *and to secure the performance of purely monetary obligations."* *First Empire Bank-New York,* 572 F.2d at 1367 (emphasis added). The standby credits at issue here may operate, at some level, as guarantees of a municipality's monetary obligations, but this observation merely begins rather than ends the inquiry.

■ The critical distinction between an impermissible guarantee and a valid letter of credit is, as plaintiff recognizes, the nature of the obligation undertaken by the bank. A contract of guaranty "creates a secondary liability on the pre-existing obligation of another ... to pay in the event that the other does not." *Bank of North Carolina v. Rock Island Bank,* 570 F.2d 202, 206 n. 7 (7th Cir.1978). A guaranty is "ancillary to some other contract or relationship, so that a dispute as to the rights or obligations of parties to the contract of guaranty can only be resolved by determination of the rights and obligations of parties to the principal contract or relationship." Harfield at 164. A proper letter of credit, on the other hand, "creates an absolute, independent obligation." *First Empire Bank-New York,* 572 F.2d at 1366. It imposes a primary obligation on the bank to make payment upon presentation of specified documents, and any dispute as to the rights and obligations of those party to this independent contract "must be resolved by reference only to the letter of credit and not to any other contract or relationship." Harfield at 163–64.

Plaintiff contends that Citibank's standby credits create an impermissible secondary obligation on the part of the subsidiary. Plaintiff argues that the subsidiary's obligation to make payment is triggered only by the *actual* failure of the municipality, the primary obligor, to pay its bondholders. The subsidiary's obligation is therefore ancillary to, and dependent upon, the primary relationship between the bond issuer and bondholders, and any disputes concerning the subsidiary's obligation, plaintiff insists, must of necessity be resolved by reference to this primary relationship.

■ The Court does not agree. It is again true in the broadest sense that the subsidiary's obligation is "dependent" on that of the municipality, for bondholders could not present notice of a default until the bonds were due and unpaid. This, however, does not make the subsidiary's liability secondary. The subsidiary's obligation is triggered by *presentation* of documents—either a notice of default or the unpaid bonds themselves after the date they come due. It is this obligation to pay "on the presentation of specified documents *showing a default, rather than upon proof of the fact of default"* that distinguishes the primary obligation of a permissible standby letter of credit from the secondary liability of a contract of guaranty. *Bank of North Carolina v. Rock Island Bank,* 570 F.2d at 206 n. 7; *see also Wichita Eagle & Beacon Publishing Co. v. Pacific National Bank,* 493 F.2d 1285, 1286 (9th Cir.1974) (instrument which did not provide for payment upon presentation of specified documents but rather required actual existence in fact of a series of conditions is not a letter of credit despite its name). And it is this obligation to pay upon presentation of specified documents that led the Comptroller to conclude that Citibank's municipal bond insurance is the functional equivalent of a standby letter of credit.

The instant transaction is functionally equivalent to a standby letter of credit because the event of default giving rise to the operating subsidiary's obligation to pay is the same as the documentation requirement for a draw under a standby letter of credit: presentation of the unpaid bond on the date payment is due or notification by the bond trustee that payment has not been made. These two aspects of the transactions are functionally equivalent because the operating subsidiary will not be able to claim that default has not occurred any more than a bank would be able to claim that documentation requirements for a draw had not been met.

AR at 99.[6] Far from being arbitrary or capricious, this conclusion is eminently reasonable. The Court therefore finds that the Comptroller properly concluded that Citibank's standby credits do not violate the no-guarantee rule.[7]

### C. *The Bank Holding Company Act Question*

Plaintiff's final attack on the Comptroller's decision concerns the agency's failure to seek the Federal Reserve Board's approval of the subsidiary's insurance activities. The sale of municipal bond insurance by Citibank's subsidiary will involve Citibank's holding company, Citicorp, in the insurance business. According to plaintiff, there is at least a substantial question as to whether a regulated bank holding company is permitted under the BHCA to engage in the insurance business through its subsidiaries. As the Board has exclusive regulatory jurisdiction under that Act, plaintiff argues that the Comptroller exceeded its authority in approving the subsidiary's insurance activities without deferring to the Board on this substantial BHCA question.

■ In response, defendant Citibank challenges plaintiff's reading of the BHCA and argues that the Act does not prohibit bank holding company involvement in insurance activities, while the Comptroller contends that the "substantial question" doctrine established in *Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 43 L.Ed.2d 386 (1965), applies only to bank charter applications and has no bearing on the present matter. The Court finds it unnecessary, however, to address these contentions, for as defendants correctly note, the Board's own regulations establish that where a national bank establishes an operating subsidiary that the Comptroller deems permissible under the National Bank Act, the Board will defer to the Comptroller's judgment. Section 4(c)(5) of the BHCA provides that a holding company may own "shares which are of a kind and amounts eligible for investment by national banking associations under the provisions of section 24 of [the National Bank Act]." 12 U.S.C. § 1843(c)(5) (1982). In implementing this statutory provision, the Board has issued regulations which provide, in pertinent part, that "[a] national bank or its subsidiary may, without the Board's approval ... acquire or retain securities on the basis of section 4(c)(5) of the BHC Act

**6.** The fact that the subsidiary is obligated to make payment upon presentation of specified documents also disposes of plaintiff's argument that the standby credits do not satisfy the requirements of the Uniform Commercial Code (UCC) or the Uniform Customs and Practices for Documentary Credits (UCP). Both the UCC and UCP condition the validity of letters of credit on the bank's obligation to make payment upon documents without reference to any other contracts or proof of extrinsic facts. *See* UCC §§ 5–114; UCP Arts. 3 & 4. As just noted, that is precisely the case here.

**7.** Plaintiff makes two additional arguments which do not merit extended discussion. First, plaintiff states that nothing in Citibank's submission suggests that it is barred from raising defenses against bondholders that the municipality itself could raise. This is incorrect, for as just noted, the subsidiary must make payment upon presentation of the proper documents. Language in the specimen insurance policy stating that the subsidiary will pay amounts "which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer," *see* Specimen Municipal Bond Insurance Policy, Exhibit C to Affidavit of William Larsen, App.

283, merely tracks the language of the Comptroller's regulation on standby letters of credit, *see* 12 C.F.R. § 32.2(e) (1985), and does not impose a requirement of proof of *actual* default before the subsidiary's obligation is activated. This reference to the instrument's underlying purpose does not render it an impermissible guarantee. Plaintiff also argues that the subsidiary will only have a right of subrogation against any defaulting municipality, rather than the unqualified right to reimbursement required by the Comptroller's own regulations governing letters of credit. Those regulations, however, do not purport to define letters of credit in absolute terms, but instead set out guidelines establishing "sound banking practices." 12 C.F.R. § 7.7016 (1985). Neither the case law nor the commentators distinguish letters of credit from guarantees on the basis of the bank's rights to reimbursement from the customer, but rather on the nature of the bank's obligation to pay beneficiaries. Thus, plaintiff's contention is irrelevant. To the extent plaintiff is challenging the Comptroller's determination that the subsidiary's subrogation rights are consistent with sound banking practices, plaintiff is simply quarreling with the agency's expert judgment on a matter committed to its discretion.

in accordance with the regulations of the Comptroller of the Currency." 12 C.F.R. § 225.22(d)(1) (1985). In short, a bank holding company may own through its subsidiaries any operating subsidiary whose activities are deemed permissible under the National Bank Act by the Comptroller. As that is precisely the case here, the Comptroller was under no obligation to stay the effect of its approval of Citibank's municipal bond insurance activities or otherwise seek Board acquiescence in those activities.

In effect, plaintiff asks the Court to ignore the Board's own regulation by contending that the regulation is nothing more than a statement of policy that the Board is currently re-examining. Such an argument is unavailing. This Court may not disregard binding and valid regulations by simply labeling them "mere policy statements." The Board repromulgated this "policy" as recently as 1984, *see* 49 Fed. Reg. 794 (1984), and has yet to rescind it notwithstanding plaintiff's claim that it is under active review. Certainly the Comptroller cannot be said to have acted arbitrarily or capriciously by adhering to the Board's own regulations.

### III

In sum, the Court finds that Citibank's municipal bond insurance activities are permissible under the National Bank Act and that the Comptroller correctly so found. The sale of municipal bond insurance in the form of standby credits is a basic credit transaction consistent with a bank's traditional credit activities. Such standby credits are the functional equivalent of standby letters of credit and, like such credit instruments, do not run afoul of the traditional no-guarantee rule. Finally, the Comptroller's determination that this credit activity is within a bank's authorized powers effectively disposed of any questions arising under the BHCA, as governing Federal Reserve Board regulations permit bank holding companies to own subsidiaries engaged in activities permissible under the National Bank Act. Accordingly, summary judgment will be entered in favor of defendant Comptroller of the Currency and defendant-intervenor Citibank and against plaintiff American Insurance Association. A separate judgment accompanies this opinion.