AMERICAN INSURANCE
ASSOCIATION,
Appellant,

v.

Robert L. CLARKE, Comptroller of the
Currency, et al.

No. 87–5128.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1988.

Decided Aug. 23, 1988.

Opinion on Rehearing Jan. 6, 1989.

William L. Patton, with whom Martin E. Lybecker and Alan G. Priest, Washington, D.C., were on the brief, for appellant.

Barbara C. Biddle, Atty. Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen. at the time the brief was filed, Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Anthony J. Steinmeyer, Atty., Dept. of Justice, L. Robert Griffin, and Mark Leemon, Attys., Office of Comptroller of the Currency, Washington, D.C., were on the brief, for federal appellees.

Arnold M. Lerman, with whom Christopher R. Lipsett, Kerry W. Kircher, and Murray A. Indick, Washington, D.C., were on the brief, for appellee Citibank, N.A.

Jamie S. Gorelick and Jonathan B. Sallet, Washington, D.C., were on the brief for Independent Ins. Agents of America, Inc., et al., amici curiae urging reversal.

John R. Bolton, Asst. Atty. Gen., Mark Sullivan III, Gen. Counsel, Dept. of Treasury, Jay B. Stephens, U.S. Atty., Paul A. Schott, Chief Counsel, Office of the Comptroller of the Currency, and Anthony J. Steinmeyer, and John F. Daly, Attys., Dept. of Justice, were on the supplemental brief on rehearing for federal appellees.

Arnold M. Lerman, Christopher R. Lipsett, and Murray A. Indick were on the supplemental brief on rehearing for appellee Citibank, N.A.

Martin E. Lybecker, William A. Patton, and Alan G. Priest were on the supplemental brief on rehearing for appellant.

Jonathan B. Sallet was on the supplemental brief on rehearing for amici curiae Independent Insurance Agents of America, Inc., et al.

John J. Gill, Gen. Counsel, and Michael F. Crotty, Associate Gen. Counsel (American Bankers Ass'n), and Ernest Gellhorn, David W. Roderer, Robert C. Jones (Conference of State Bank Supervisors), and Leonard J. Rubin (Independent Bankers Ass'n of America) were on the joint amici curiae brief on rehearing for Conference of State Bank Supervisors, et al.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The American Insurance Association appeals from a summary judgment entered by the district court. Appellant challenges the Comptroller of the Currency's concurrence in a proposal by Citibank to form a subsidiary to offer municipal bond insurance. We affirm the district court's rejection of appellant's claim that the Comptroller's action violates the National Bank Act, but we reverse the court's dismissal of appellant's challenge under the Bank Holding Company Act.

## I. BACKGROUND

Citibank, N.A. ("Citibank"), a national bank chartered under 12 U.S.C. § 21 (1982), is a wholly-owned subsidiary of Citicorp, a registered bank holding company. On January 30, 1985, Citibank notified the Comptroller of the Currency ("Comptroller") under 12 C.F.R. § 5.34(d)(1) (1988) of its intention to establish a subsidiary to offer municipal bond insurance. As Citibank's subsidiary, the American Municipal Bond Assurance Corporation ("AMBAC") is subject to the same restrictions applicable to national banks. 12 C.F.R. § 5.34(d)(2)(i) (1988).

The service offered by AMBAC under Citibank's proposal would operate as follows. A municipality wishing to issue bonds would apply to AMBAC for insurance. (We will refer to AMBAC's service as "insurance" without deciding whether it meets the legal criteria for insurance under various regulatory schemes.) After engaging in a traditional credit analysis (determining the ability of the issuer to satisfy the claims in the event of default), AMBAC would offer the insurance in the form of a "standby credit." If the issuer defaults, the bondholders would present documentary proof of nonpayment to AMBAC, which would pay the interest and principal due the bondholders. AMBAC would then be subrogated to the rights of the bondholders against the issuer.

The purpose of this arrangement is to reduce the issuer's costs of borrowing. As potential bond purchasers may be unfamiliar with the creditworthiness of particular municipal issuers, the market price for uninsured bonds would reflect a risk premium, resulting in an inflated interest rate. The bank, which is more familiar with the issuer's creditworthiness, can substitute its own more widely known credit for the issuer's, thus reducing the cost of borrowing by bridging the information gap.

The Comptroller concurred in Citibank's proposal, concluding that AMBAC's activities were permissible under the National Bank Act ("NBA") (codified in scattered sections of U.S.C., see note following 12 U.S.C. § 38 (1982)), and the Bank Holding Company Act ("BHCA"), 12 U.S.C. §§ 1841–50 (1982). See Interpretive Letter No. 338, [1985–1987 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 77,791 (May 2, 1985). AMBAC began operations shortly thereafter. The American Insurance Association ("AIA"), a trade group representing property and casualty insurance companies, then repaired to the district court, seeking declaratory and injunctive relief to set aside the Comptroller's order. Citibank intervened as a party defendant. The district court eventually entered summary judgment for the Comptroller, American Ins. Ass'n v. Clarke, 656 F.Supp. 404 (D.D.C.1987), and the AIA appealed.

## II. DISCUSSION

### A. Standard of Review

The Supreme Court recently reaffirmed that the principles concerning judicial deference to an agency's interpretation of its

governing statute apply to the Comptroller's interpretation of the NBA. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987). Those principles, of course, were outlined by *Chevron, U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). If Congress has spoken directly to the precise question at issue, we must enforce that unambiguously expressed intent. *Id.* at 842–43, 104 S.Ct. at 2781–82. If congressional intent is unclear, however, we will defer to the agency's permissible construction, *id.* at 843, 104 S.Ct. at 2781–82, i.e., one that is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23*, — U.S. —, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987).

█ The same cannot be said for the Comptroller's interpretation of the BHCA. As we discuss at greater length below at 284–285, the Board of Governors of the Federal Reserve System has exclusive jurisdiction to interpret and apply the BHCA. *See generally Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 419, 85 S.Ct. 551, 556–57, 13 L.Ed. 2d 386 (1965). *Chevron* does not apply in this situation: "[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference." *Department of the Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C.Cir.1988), and cases cited.

We are situated no differently than the district court in making these determinations. "Because an award of summary judgment reflects 'a determination of law rather than fact,' we do not defer to the District Court's conclusions but consider the matter de novo." *Nepera Chem., Inc. v. Sea–Land Serv., Inc.*, 794 F.2d 688, 699 (D.C.Cir.1986) (footnote omitted).

### B. National Bank Act

█ Appellant first argues that the Comptroller's approval of the Citibank proposal violates the NBA. As the NBA does not specifically prohibit AMBAC's municipal bond insurance, congressional intent is unclear, and we will defer to the Comptroller's decision if it is rational and consistent with the statute.

Under 12 U.S.C. § 24 (Seventh) (1982 & Supp. IV 1986), a national bank has

all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provision of title 62 of the Revised Statutes.

Appellant argues that a bank may engage only in those activities specifically mentioned and others incident (i.e., convenient or useful) to the expressly authorized activities. Brief for Appellant at 28–29.

We agree with the district court, however, that this reflects "a narrow and artificially rigid view of both the business of banking and the [NBA]." 656 F.Supp. at 408. Rather than attempt to correlate municipal bond insurance to a specific power mentioned in section 24 (Seventh), the Comptroller focused on the essence of AMBAC's service: the provision of credit. We agree with the district court that

the business of banking involves the substitution of the "[bank's] own credit, which has general acceptance in the business community, for the individual's credit, which has only limited acceptability.... It is the end for which a bank exists." Indeed, the extension of credit on both a secured and unsecured basis is such a long-standing practice under the [NBA] that credit is today viewed as one of "[t]he principal banking 'products.'" Banks provide this "product" in a variety of forms not specifically enumerated in the [NBA]: they offer irrevocable lines of credit, standby and mercantile letters of credit, and check guaranty and credit card programs. *See e.g.*, 12 C.F.R. §§ 7.7017, 7.7016, 7.378, 32.3 (1985).

656 F.Supp. at 408 (citations omitted; ellipsis original).

We do not think the Comptroller acted irrationally in concluding that AMBAC's

municipal bond insurance was part of the business of banking, sufficiently similar to credit services routinely performed by banks. The Comptroller, in his expert financial judgment, concluded that AMBAC's proposed use of standby credits to insure municipal bonds was functionally equivalent to the issuance of a standby letter of credit, a device long recognized as within the business of banking.

■ To understand the Comptroller's comparison of AMBAC's standby credits with standby letters of credit, we begin with a brief review of the operation of letters of credit, which come in two basic forms: *commercial* and *standby*. A basic function of the commercial letter of credit is to make it possible for a seller to ship goods to a buyer whose creditworthiness is unknown to him in confidence that the goods will be paid for.

> Stripped to its essentials, the [commercial letter of credit] transaction runs as follows: the buyer arranges for a bank—whose credit the seller will accept—to issue a letter of credit in which the bank agrees to pay drafts drawn on it by the seller if, but only if, such drafts are accompanied by specified documents, such as bills of lading or air freight receipts, representing title to the goods that are the subject matter of the transaction between buyer and seller. The bank undertakes this obligation for a specified period of time.

Verkuil, *Bank Solvency and Guaranty Letters of Credit*, 25 Stan.L.Rev. 716, 718 (1973). The obligation created by the letter of credit is absolute. Upon the presentation of the stipulated documents by the seller, the bank is required to make the payment irrespective of any counterclaims the buyer might have against the seller. ■ A standby letter of credit represents the other side of the commercial letter of credit coin. Whereas the latter is used to guarantee payment upon performance, the former guarantees payment upon a failure to perform. Thus, by way of illustration, if a purchaser is concerned over the seller's ability to deliver the contracted goods on schedule, the seller may ask *his* bank to open a standby letter of credit in favor of the buyer. If the buyer subsequently presents documents showing that the seller has failed to deliver the goods, his bank is obliged to pay the buyer the amount specified in the standby letter. The bank will be reimbursed by the seller.

Although the two varieties of letters of credit differ, they serve the same essential purpose: to facilitate transactions by substituting the credit of the bank for that of one of the contracting parties. Banks have long been permitted to provide this form of credit. *See, e.g.,* 12 C.F.R. § 7.7016 (1988) (letters of credit); *First Empire Bank–New York v. FDIC,* 572 F.2d 1361, 1367 (9th Cir.) (standby credits), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); 12 C.F.R. § 32.2(e) (1988) (recognizing standby letters of credit as service provided by banks). As one commentator has explained:

> The nature of the banking business implies the lawful power to make loans. A necessary incident of that power is the power to commit to make the loan at a future date. If that future commitment is made to a third party, it amounts to a present loan of credit. So long as the bank's promise is made for the account of its customer, and is a money promise, its characterization or form should be immaterial in determining its validity....

H. Harfield, *Bank Credits and Acceptances* 165–66 (5th ed. 1974).

The Comptroller concluded that AMBAC's municipal bond insurance was sufficiently similar to a standby letter of credit to qualify as part of the business of banking. The Comptroller noted that the insurance met all but one of the guidelines ordinarily imposed on letters of credit "[a]s a matter of sound banking practice," 12 C.F.R. § 7.7016 (1988): AMBAC's standby credits are for a definite term, limited in amount, oblige AMBAC to pay upon presentation of documents (the unpaid bond or notice from the trustee), and result in an unqualified obligation of the issuer to reimburse the bank (through subrogation). *See id.* The AMBAC insurance departs from the guidelines only in that it is not labelled

"letter of credit." The Comptroller observed, however, that the regulation does not establish an inflexible definition of letters of credit, each element of which must be satisfied in every case. Rather, it provides a guideline for sound banking practice that may be waived in part when appropriate. *See, e.g.,* Comptroller of the Currency, *Interpretive Letter No. 214,* [1981–1982 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 85,295, at 77,452 (July 23, 1981). Moreover, the Comptroller's lending limits refer to a standby letter of credit as

> any letter of credit, or similar arrangement, *however named or described,* which represents an obligation on the part of the issuer ... (3) to make payment on account of any default by the account party in the performance of an obligation.

12 C.F.R. § 32.2(e) (1988) (emphasis added). The Comptroller's conclusion that AMBAC's standby credits satisfy this standard is well within his discretion.

In addition to evaluating AMBAC's standby credits according to the regulatory definitions, the Comptroller also concluded that AMBAC's service was *functionally* equivalent to a standby letter of credit because AMBAC will engage in a financial rather than an actuarial analysis. In other words, AMBAC will not rely on an estimate of the likelihood of default, but on the issuer's financial strength in the event of default. The district court correctly concluded that the Comptroller's expert judgment in this regard should not be overturned. *See* 656 F.Supp. at 409–10.

Appellant's final claim is that AMBAC's standby credits are impermissible guarantees because AMBAC is reimbursed by means of subrogation. But the *means* of reimbursement is not essential in distinguishing a guaranty from a standby letter of credit. The "central distinction" between the two is that the standby credit

> creates a primary liability on an original obligation—to pay on the presentation of documents—whereas the contract of guaranty creates a secondary liability on the pre-existing obligation of another—to pay in the event that the other does not.

*Bank of North Carolina, N.A. v. Rock Island Bank,* 570 F.2d 202, 206 n. 7 (7th Cir.1978). The Comptroller properly classified AMBAC's insurance as a standby credit because AMBAC's obligation to pay arises upon the presentation of documents (the unpaid bond or notice from the trustee), not upon actual proof of the issuer's default. The means of reimbursement is not controlling in this classification.

Appellant correctly notes that the Comptroller's regulations provide that "the bank's customer should have an *unqualified* obligation to reimburse the bank for payment under the letter of credit." 12 C.F.R. § 7.7016(e) (1988) (emphasis added). This requirement, however, ordinarily is imposed "[a]s a matter of sound banking practice," 12 C.F.R. § 7.7016, not as a means of distinguishing a permissible banking practice from an impermissible guaranty. *See* Comptroller of the Currency, *Interpretive Letter No. 295,* [1985–1987 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 85,465, at 77,708 (July 3, 1984) (five requirements of section 7.7016 "are 'merely' matters of 'sound banking practice;' they do not circumscribe the limits of the 'no guaranty' rule"); *see also above* at 8.

Appellant nevertheless challenges the Comptroller's determination that AMBAC's credits satisfy the sound banking practice requirement. AMBAC's right to reimbursement from the issuer is not unqualified, argues appellant, because AMBAC is merely subrogated to the rights of the bondholders. Its right to repayment is therefore subject to whatever defenses that issuer would have against the bondholder. Appellant does not indicate the likelihood that municipal issuers would raise such defenses. Nor does it demonstrate why this risk is greater than the risk a bank would undertake by purchasing the bonds directly, as permitted by 12 U.S.C. § 24 (Seventh) (1982).

Appellant claims that the Comptroller's treatment of subrogation here is inconsistent with his decision in *Interpretive Letter No. 295.* The Comptroller there rejected a bank's application to offer political risk insurance to other banks making offshore

loans. Among his concerns was that the bank offering the insurance would be subrogated to the loaning bank in the event of default, thus potentially involving the insuring bank in disputes between the debtor and the loaning bank. [1985–87 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 85,465, at 77,709. Of greater significance, however, was the complete absence of credit evaluation by the insuring bank, which relied totally on actuarial estimates of the likelihood of the political risks causing default. *Id.* Such actuarial assessments are problematic generally, and especially so when the bank proposes to insure against highly speculative risks. In the present case, the Comptroller concluded that the marginal increase in risk caused by AMBAC's method of reimbursement was insufficient to create an unsound banking practice, in view of the totality of the circumstances. This does not represent an abrupt and unexplained departure from agency precedent.

## C. Bank Holding Company Act

The BHCA, administered by the Board of Governors of the Federal Reserve System ("Board"), limits the non-banking activities of bank holding companies (entities that control banks). A bank holding company may not "acquire direct or indirect ownership or control of any voting shares of any company which is not a bank," 12 U.S.C. § 1843(a)(1) (1982), subject to a number of statutory exceptions, 12 U.S.C. § 1843(c). The most commonly invoked exception is 12 U.S.C. § 1843(c)(8), which exempts

> shares of any company the activities of which the Board after due notice and opportunity for hearing has determined ... to be so closely related to banking ... as to be a proper incident thereto, but for purposes of this subsection it is not closely related to banking ... for a bank holding company to provide insurance as a principal, agent or broker [subject to certain exceptions]....

Citicorp, a bank holding company, controls Citibank, a national bank. Citibank in turn controls AMBAC, which is not itself a bank.

Appellant argues that the Comptroller should not have concurred in Citibank's proposal without requiring Citicorp to obtain the Board's approval under the BHCA. Appellant claims the proposal raised a substantial question under the BHCA because AMBAC would be engaged in insurance, an activity specifically excluded from the "closely related to banking" standard. The Comptroller was obliged, this argument concludes, to defer his final approval pending the Board's resolution of that issue.

■ Although the Board has exclusive jurisdiction to administer the BHCA, *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 419, 85 S.Ct. 551, 556–57, 13 L.Ed.2d 386 (1965), the Comptroller may, in "exceptional circumstances," be required to defer his final approval under the NBA pending completion of the Board's inquiry under the BHCA. *Id.* at 426 n. 7, 85 S.Ct. at 560 n. 7. In *Whitney*, a bank sought to form a bank holding company that would own the establishing bank and form a new bank in a different Louisiana parish. The Comptroller gave preliminary approval, subject to the action of the Board. The Board then approved the plan under the BHCA, and competitor banks petitioned for review in the Fifth Circuit. After the Board's decision, Louisiana adopted a law prohibiting bank holding companies from opening banking subsidiaries. The competitors then sought to enjoin the Comptroller from issuing a certificate authorizing the opening of the new bank, arguing that the BHCA prohibited approval of actions proscribed by state law.

The Supreme Court concluded that the suit against the Comptroller was improper because the Board had the responsibility in the first instance to determine the merits of a BHCA challenge. The Court noted that the Comptroller's decision was not a final action subject to review: even if he approved the transaction, his action "would be completely negated" if the Board's approval was reversed by the Fifth Circuit. 379 U.S. at 423, 85 S.Ct. at 559. The Court declined, however, to rule that BHCA issues are always irrelevant to the Comptroller's decision:

[T]here may be exceptional circumstances under which equity may stay the hand of the Comptroller in issuing a certificate to a new bank. Obviously if the holding company application has not been acted upon by the Board, the Comptroller would have no power to issue the certificate and his persistence in doing so would subject him to the temporary orders of a court of competent jurisdiction.

379 U.S. at 426 n. 7, 85 S.Ct. at 560 n. 7. *Whitney,* as then before the Court, was not such a case. The Court therefore dismissed the complaint against the Comptroller, but stayed its judgment for sixty days to permit the parties to move in the Fifth Circuit for a remand to the Board to consider the effect of the new Louisiana statute.

*Whitney* has been interpreted as requiring the Comptroller to defer the issuance of a bank charter pending completion of an inquiry by the Board when the transaction presents a "substantial" question under the BHCA. *American Bank of Tulsa v. Smith,* 503 F.2d 784, 789 (10th Cir.1974). We are aware of no case that applies the substantial question doctrine outside the context of the chartering of a new bank, and we do not decide that question today. It is perfectly clear, however, that the Comptroller, if he so chooses, may condition any approval on subsequent action by the Board. *See, e.g., Gravois Bank v. Board of Governors,* 478 F.2d 546, 548 (8th Cir.1973).

In this case, the Comptroller did not exercise his discretion to condition his approval on subsequent Board approval because he thought the BHCA did not apply. The Comptroller gave two reasons for his conclusion: (1) the BHCA limits only the nonbank subsidiaries of bank holding companies themselves, not of their banking subsidiaries, and (2) AMBAC's standby credits were not insurance under the BHCA. The district court affirmed the Comptroller's conclusion for a different reason: section 4(c)(5) of the BHCA permits any investments approved by the Comptroller. We reject each of these arguments.

First, the Comptroller thought that the BHCA did not limit the subsidiaries of national banks that are in turn owned by bank holding companies. A bank holding company, however, is prohibited from acquiring "direct *or indirect* ownership or control of any voting shares of any company which is not a bank," unless an exception applies. 12 U.S.C. § 1843(a)(1) (1982) (emphasis added). Shares owned or controlled by any subsidiary of a holding company are "deemed to be indirectly owned or controlled by such bank holding company." 12 U.S.C. § 1841(g)(1) (1982). Citicorp manifestly exercises indirect control over AMBAC because AMBAC's parent is Citicorp's subsidiary. *See* 12 C.F.R. § 225.101(c) (1988) (BHCA's investment prohibitions apply to holding company's indirect ownership of shares in nonbanking company owned directly by banking subsidiary). The Board has repeatedly held that "the acquisition of voting shares by a subsidiary bank of a bank holding company is treated as an acquisition by the parent bank holding company and, on this basis, is subject to the nonbanking limitations of section 4 of the [BHCA]." *Security Pacific Corp.,* 72 Fed.Res.Bull. 800, 801 (1986); *see also Merchants Nat'l Corp.,* 73 Fed. Res.Bull. 876, 880 (1987), *vacated in part on other grounds sub nom. Independent Ins. Agents of Am. v. Board of Governors,* 838 F.2d 627 (2d Cir.1988).

The Comptroller's second rationale, that AMBAC's standby credits were not insurance under the BHCA, was not his judgment to make. The Comptroller could conclude that the standby credits were part of the business of banking under the NBA even though they resemble insurance in some respects, as the district court observed. 656 F.Supp. at 409–10. Unlike the NBA, however, the BHCA specifically provides that bank holding companies cannot acquire nonbank companies that provide insurance. 12 U.S.C. § 1843(c)(8). Whether AMBAC's standby credits constitute insurance under the BHCA therefore requires a different analysis than that employed under the NBA. That analysis must be undertaken by the Board in the first instance.

Although the Comptroller may, in the exercise of his discretion, conclude that the questions under the BHCA are so frivolous that he should not await the Board's judgment, this was not such a case. While we do not decide whether the Comptroller must await the Board's approval whenever a substantial BHCA question is presented, it was inappropriate for the Comptroller to fail to consider that possibility by concluding that there was no substantial BHCA question in this case.

The district court thought the BHCA inapplicable for another reason. It relied on 12 U.S.C. § 1843(c)(5) (1982), which permits a bank holding company to own "shares which are of the kinds and amounts eligible for investment" by national banks under 12 U.S.C. § 24. The Board's regulation provides: "A national bank or its subsidiary may, without the Board's approval ..., acquire or retain securities on the basis of section 4(c)(5) of the BHC Act in accordance with the regulations of the Comptroller of the Currency." 12 C.F.R. § 225.22(d)(1) (1988). The Board's contemporaneous explanation of the regulation states that it permits banks to "acquire or retain *subsidiaries*" in accordance with the Comptroller's rules. 49 Fed.Reg. 794, 811 (1984) (emphasis added). In the district court's view, "a bank holding company may own through its subsidiaries any operating subsidiary whose activities are deemed permissible under the [NBA] by the Comptroller." 656 F.Supp. at 414.

■ We disagree with this aspect of the district court's otherwise excellent analysis. Section 1843(c)(5) permits bank holding companies to own shares "eligible for *investment*" by national banks under 12 U.S.C. § 24. Section 24 (Seventh) permits a national bank to "purchase for its own account investment securities," defined as "marketable obligations, evidencing indebtedness...." The "investment securities" exception in section 24 simply does not apply to a bank's ownership of the *stock* of an *operating* subsidiary, nor does section 1843(c)(5) exempt such interests from the BHCA. These interests are neither an "in-

vestment" nor a "security" as defined in section 24 (Seventh).

This reading of the plain language of the statutes is confirmed by two additional considerations. First, section 24 (Seventh) permits banks to acquire investment securities "under such limitations and restrictions as the Comptroller of the Currency may *by regulation* prescribe" (emphasis added); *see also* 12 C.F.R. § 225.22(d)(1) (1988) (under section 1843(c)(5), Board permits banks to acquire securities "in accordance with the regulations of the Comptroller"). This clearly refers to the Comptroller's general regulatory classification of debt securities in which banks may invest. *See* 12 C.F.R. Part 1 (1988). It does not apply to the Comptroller's *adjudicative* determination that a particular activity by a bank's subsidiary is permissible under the NBA.

Second, 12 U.S.C. § 1843(a)(2) (1982), prohibits certain bank holding companies from retaining

> direct or indirect ownership or control of any voting shares of any company which is not a bank or a bank holding company or engage in any activities other than (A) those of banking ..., and (B) those permitted under [§ 1843(c)(8)].

If section 1843(c)(5) permits bank holding companies to acquire a subsidiary engaged in activities approved by the Comptroller, section 1843(a)(2) becomes difficult to understand. A bank holding company could acquire a non-bank subsidiary of a bank, but would be prohibited from retaining it if subject to section 1843(a)(2). This irrational result would be avoided if section 1843(c)(5) were read as overriding section 1843(a)(2), but then all of section 1843(c), including 1843(c)(8), necessarily would override section 1843(a)(2). The specific reference in section 1843(a)(2) to section 1843(c)(8) would be surplusage; Congress would not have mentioned only section 1843(c)(8) if it intended subsection (c)(5) and (c)(8) to be treated identically.

We recognize that the Board interpreted its regulation implementing section 1843(c)(5) as permitting a national bank subsidiary of a holding company to acquire subsidiaries in accordance with the Comp-

troller's rules. 49 Fed.Reg. at 811. As this interpretation conflicts with the plain meaning of the BHCA, however, we decline to enforce it. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

The upshot is that Citicorp must obtain Board approval under 12 U.S.C. § 1843(c)(8). The Comptroller did not consider what effect the applicability of the BHCA would have on his decision because he mistakenly thought the BHCA did not apply. Accordingly, we direct the district court to return the case to the Comptroller for further action consistent with this opinion.

## III. CONCLUSION

The judgment of the district court upholding the Comptroller's action under the National Bank Act is affirmed. The judgment as to the Bank Holding Company Act is reversed and remanded for further action consistent with our opinion.

*So ordered.*

## ON PETITIONS FOR REHEARING
Opinion PER CURIAM.

PER CURIAM:

On August 23, 1988, this panel issued its decision (see page 278) ("Initial Decision"). On October 24, 1988, the panel granted the petitions for rehearing filed by appellees (the Comptroller of the Currency, the United States, and Citibank) on two questions:

1. Was it appropriate for this court to address the Comptroller of the Currency's interpretation of the Bank Holding Company Act?
2. Did Citibank's acquisition of the American Municipal Bond Assurance Corporation require the prior approval of the Federal Reserve Board under section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c)(8)?

The factual and procedural background of this case is fully set forth in the Initial Decision. In brief, the American Insurance Association ("AIA") challenges the concurrence by the Comptroller of the Currency ("Comptroller") in the proposed acquisition of a municipal bond insurance subsidiary (American Municipal Bond Assurance Corporation) ("AMBAC")) by a chartered national bank (Citibank, N.A.) which is, in turn, the wholly-owned subsidiary of a bank holding company (Citicorp). AIA argued that the Comptroller's action violated provisions of both the National Bank Act ("NBA"), 12 U.S.C. §§ 21 *et seq.*, and the Bank Holding Company Act ("BHCA"), 12 U.S.C. §§ 1841–50. The district court concluded that the Comptroller's actions were based on a reasonable interpretation of the NBA, and that as the Comptroller had relied on the General Reserve Board's ("Board") own interpretation of the BHCA, the court could not declare his action arbitrary or capricious. *American Ins. Ass'n v. Clarke*, 656 F.Supp. 404 (D.D.C.1987). Accordingly, the court entered summary judgment for the Comptroller, and the AIA appealed.

In Part II.B. of our Initial Decision, we held that the Comptroller had properly found that Citibank's acquisition of AMBAC was authorized under the NBA. In Part II.C., however, we ruled that the Comptroller had erred in construing the BHCA as permitting the establishment of the municipal bond insurance subsidiary.

On reviewing the supplemental briefs submitted by the parties, we now conclude that it was inappropriate for us to have reached the latter question. Although the Comptroller concluded, *inter alia*, that section 4(c)(8) of the BHCA, 12 U.S.C. § 1843(c)(8), did not prohibit Citibank's acquisition of AMBAC, that finding was not essential to his determination that the acquisition was permitted by the NBA. Furthermore, because the Comptroller's jurisdiction arises under the NBA rather than the BHCA, his interpretation of the latter statute is without precedential effect and will not prevent the AIA from petitioning the Board for a ruling on the propriety of the acquisition. Indeed, Congress has granted the Board initial jurisdiction to conduct an administrative hearing to decide BHCA issues, 12 U.S.C. § 1842(b), and has provided for direct judicial review of Board decisions in a court of appeals. *Id.* § 1848.

We recognize that the Comptroller and the Board have overlapping jurisdiction in certain situations. For example, in *Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), the Comptroller preliminarily approved a national bank's proposal to open a new bank as part of a complex holding company transaction that was subject to the Board's final approval under the BHCA, which was granted. Competitor banks sought to enjoin the Comptroller from issuing a certificate chartering the new bank, claiming that a state law enacted after the Board's approval nullified the Board's action. The Supreme Court dismissed the suit against the Comptroller in the district court as improper because the Board had exclusive jurisdiction in the first instance to determine the merits of a BHCA challenge with judicial review only in a court of appeals. *Id.* at 419–23, 85 S.Ct. at 556–59. The Court noted, however, that "there may be *exceptional circumstances* under which equity may stay the hand of the Comptroller in issuing a certificate to a new bank." *Id.* at 426 n. 7, 85 S.Ct. at 560 n. 7 (emphasis added).

While declining to decide the precise scope of *Whitney*, we conclude that the facts of this case do not present the "exceptional circumstances" that would warrant our reaching the merits of the AIA's contention that the challenged acquisition is prohibited by the BHCA. Accordingly, we affirm Part II.B. of our Initial Decision and vacate Part II.C.

*So ordered.*